

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-24-00215-CV

_____

IN THE INTEREST OF J.H., A.H., AND S.H., CHILDREN

---

On Appeal from the 324th District Court
Tarrant County, Texas
Trial Court No. 324-679061-20

---

Before Birdwell, Bassel, and Wallach, JJ.
Memorandum Opinion by Justice Wallach

## MEMORANDUM OPINION

The trial court terminated the parental rights of S.E.A. (Mother) to her children Jacob, Aiden, and Sadie.[1] In its judgment, the trial court found the predicate termination grounds in Texas Family Code Section 161.001(b)(1)(D), (E), and (O); found that termination of Mother's parental rights was in the children's best interest; and found that Mother had not established the defense to Subsection (O) found in Section 161.001(d). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O), (d).

On appeal, Mother challenges the legal and factual sufficiency to support the Subsection (D) and (E) findings and the factual sufficiency of the best-interest finding, and she argues that the trial court erred by finding that she did not establish the defense in Section 161.001(d). Because sufficient evidence supports a finding that Mother had endangered the children and that termination was in the children's best interest, we will affirm.

## Background

To avoid repetition, we set out here only a general overview of the relevant facts and procedural history. We include a more detailed recitation below in our analysis of Mother's issues.

---

[1]We use aliases to refer to the children and identify family members by their relationship to the children. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

In 2022, after receiving a report alleging physical neglect and possible physical abuse of two of the children, the Department of Family and Protective Services offered Mother Family Based Safety Services (FBSS).[2] The Department received other reports concerning the children while the FBSS services were ongoing, and eventually, Mother asked the Department to take the children in order to give herself time "to get herself together."

The Department then filed this child-protection suit and was appointed temporary managing conservator, and it provided Mother with a service plan. That plan was later simplified to make it easier for Mother to understand it. Nevertheless, Mother was unable to complete her services by the time of trial in April 2024. At the conclusion of the trial, the trial court found the predicate grounds in Section 161.001(b)(1)(D), (E), and (O), found that Mother had not established the defense in Section 161.001(d), and found that termination was in the children's best interest. It subsequently signed an order terminating Mother's parental rights. Mother now appeals.

---

[2] "Family-based safety services are protective services provided to a family whose children are not in the conservatorship of the Department." 40 Tex. Admin. Code § 700.710 (2021) (Dep't of Fam. & Protective Servs., Services to Families). The Department's Child Protective Services Division provides these services "to families and children that need . . . assistance to: (1) protect the children from abuse and neglect; (2) help the family reduce the risk of future abuse or neglect; and (3) prevent the removal of the children from their home." *Id.*

## Standard of Review

For a trial court to terminate a parent–child relationship, the party seeking termination must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. *Id.* § 161.001(b); *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *Z.N.*, 602 S.W.3d at 545.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *Z.N.*, 602 S.W.3d at 545. We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.*; *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). When reviewing a finding for factual sufficiency, we review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the party seeking termination proved the challenged finding. Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the

4

factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

## Discussion

## I. Predicate Termination Grounds

Because it is dispositive of most of Mother's issues, we begin with her second issue, which challenges the legal and factual sufficiency of the evidence supporting the Subsection (E) ground. Subsection (E) allows termination when the parent engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangers the child's physical or emotional well-being. Tex. Fam. Code Ann. § 161.001(b)(1)(E).

"Endanger" in this context "means to expose to loss or injury" or "to jeopardize." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (quoting *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). The term "means more than a threat of metaphysical injury or potential ill effects of a less-than-ideal family environment." *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012) (quoting *Boyd*, 727 S.W.2d at 533). But the endangering conduct need not be directed at the child, and the child need not actually suffer injury. *J.F.-G.*, 627 S.W.3d at 312 (quoting *Boyd*, 727 S.W.2d at 533). "As a general rule, conduct that subjects a child to a life of uncertainty and instability" endangers the child's physical and emotional well-being. *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).

5

**A. The Evidence**

The evidence in this case painted a picture of a parent who was overwhelmed by her children's needs and a lack of resources and who, unfortunately, was unwilling or unable to engage in the services that could help her with those issues.

First, the Department presented the testimony of Michelle Hall, the caseworker for the FBSS case. She explained that the children had been injured in Mother's care, that Mother did not show improvement in her parenting abilities during the FBSS case, and that the children were taken into the Department's care at Mother's request.

- The Department had previously been involved with the older two children in 2019,[3] when then-six-week-old Aiden suffered a leg fracture. In that case, the Department removed the children from Mother and found that there was "reason to believe" the allegation of physical abuse and medical neglect. However, Mother's situation apparently improved to the Department's satisfaction; the Department eventually moved to have

---

[3]Notes in Mother's psychological evaluation report, which was admitted at trial, include references to the Department's having received other referrals regarding Mother in 2014, 2015, and 2018, but at least some of those referrals appear to have involved Mother's oldest child, who is not involved in this case. That child lives with his father. Mother was only seventeen years old in 2014, was twenty when Jacob was born, and was twenty-five when the FBSS case was opened.

6

Mother appointed as sole managing conservator, and the case ended with the children being returned to her in November 2020.[4]

- Sadie was born later that month.

- In February 2022—approximately fifteen months after the children's return to Mother—the Department received a report that Jacob and Aiden had been brought into the hospital for diarrhea because of a stomach bug, and an examination had revealed that Aiden had a severe diaper rash and that Jacob had bruising under his eyes. Hall testified that "there were several stories that were told" about the source of the bruising," "so there were never any conclusive statement[s] as to what exactly had happened."

- Around four months later, in June 2022, the Department opened the FBSS case and offered Mother a service plan. *See* 40 Tex. Admin. Code § 700.716. At that time, Jacob was five years old, Aiden was three, and Sadie was 18 months.

---

[4]The affidavit supporting removal in that case stated that Mother first blamed the injury on her younger sister with special needs, but Mother then admitted that she had accidentally hurt Aiden by pushing his legs to his abdomen too hard while changing his diaper. However, at the trial in this case, the Department did not present to the trial court any evidence explaining the cause of that injury. The only trial testimony related to the cause was Mother's testimony that the injury "wasn't [her] fault."

- The next month, the Department received a report that Aiden had bruising under his eyes. Aiden had been hit by his aunt with special needs, who was then five years old, and Mother told Hall that she had a hard time breaking up the children's arguments or redirecting them.

- Hall testified that the home in which Mother was living at that time "was very crowded. There was a lot of people living in that home," including Mother; her mother and stepfather; and "approximately around eight" children. Because there were so many children in the home, "there w[ere] concerns that there was not enough supervision going on, and that's what was resulting in the children getting hurt." The Department ruled the allegation of neglectful supervision as "reason to believe"—that is, based on all the evidence, it was more likely than not that neglectful supervision had occurred. *See id.* § 707.495.

- In December 2022, the Department received a report "regarding concerns for not being able to reach [Mother] and [Jacob] with the diaper rash."[5] Hall did not provide further details about these allegations or the Department's investigation into the report.[6]

---

[5]Jacob was five years old at the time, but the March 2023 service plan noted that he was still in diapers.

[6]Hall's removal affidavit included more detail and stated that the Department ultimately ruled out physical neglect. The affidavit further alleged another instance when

8

- In February 2023, the Department learned of a physical altercation between Mother and her grandmother that had occurred in front of the children. Mother told Hall that during the fight, her grandmother had "grabbed her hair and pushed her into the window," and the grandmother had accidentally kicked Aiden in the stomach. Notes in Mother's psychological evaluation conducted as part of this child protection case, discussed below, state that Mother had punched her grandmother in the face during this fight.

- At the end of February 2023—around a year after Hall received the first report about Aiden's diaper rash and Jacob's bruises that led to the FBSS case, Mother sent Hall a message stating that "she no longer felt like she could care for the children. She stated that she needed time to get herself together, and she wanted to find [a] placement" for the children.

- Hall attempted to find alternative placements for the children. She had a "family team meeting" and brought in the boys' former foster parents and someone with My Health My Resources (MHMR) to try to "come up with a plan as best of how [they] could all help [Mother] without the children

---

Aiden had bruising around his eyes. However, the Department did not elicit this information at trial. Because it was not presented as evidence at trial, we do not consider it.

going into care." *See id.* § 700.722 (stating that before closing an FBSS case due to removal, Department staff "will explore reasonable alternatives for keeping the child safe from abuse and neglect in the home" and that "[w]henever possible," the decision to remove child from its home should be made by the Department staff "together with the family"). That meeting was not successful, and the children were subsequently brought into care.

- Jacob was placed with his former foster parents, and Aiden and Sadie were placed with another foster family through the same agency.

In summary, Mother had been living in overcrowded conditions with persons who (whether intentionally or not) injured Aiden and Jacob, and Mother got into a physical fight with her grandmother in front of the children. Mother acknowledged that she had a difficult time keeping the children in the home from fighting.

Hall also testified about how the Department tried to help Mother obtain housing and other services during the FBSS case and about Mother's failure to work her services.

- Hall helped Mother complete the paperwork to get food stamps and get the children into day care.

- Hall told Mother the specific services that she should complete, but she did not fully complete any of them.

- One of the services that Mother did not complete was counseling. After Mother said that she had a hard time keeping appointments, Hall tried to help her set up a schedule. Hall tried to get Mother "engaged with" two different counselors and with MHMR but with no success. Hall did not see any consistent improvement from Mother during the case.

After the children were brought into care, the family had two caseworkers: Lakeya Toombs, who worked the case from March 2023 through September 2023, and Kaleigh Nogueira, who took over the case after Toombs and was the caseworker at the time of trial in April 2024. The caseworkers' testimony showed that Mother's failure to work services during the FBSS case was part of a pattern of behavior that continued after the children came into the Department's care. Toombs testified first and described the efforts that she had made to help Mother complete her service plan.

- Toombs engaged in "[a] lot of hand-holding so [that Mother] could complete or engage in her services," including weekly contact with Mother. Some of that hand-holding included Toombs's making appointments for Mother for some of the services she needed to complete.

- Toombs also helped Mother with transportation to appointments for her services; Toombs asked Mother weekly if she needed to have an Uber ride

11

set up to get to her providers or to classes that week. Nevertheless, "it was a struggle" to get Mother to engage with the providers for her services.

- For some of the appointments that Mother missed, she had a reasonable excuse, but Toombs said that "the majority of time it was, 'I just missed it[,]' or 'I overslept.'"

- During the seven months that Toombs had the case, Mother was not employed, and she did not engage in the individual counseling that was part of her service plan. She had begun but had not yet finished a "Safe Babies" class.

- The only service that Mother completed while Toombs had the case was the psychological evaluation, which was performed in June 2023.

Toombs testified about the psychological evaluation, and the report from that evaluation was admitted into evidence. The report noted that Mother faced some cognitive limitations and mental health issues.

- The evaluation included intellectual functioning testing on which Mother scored as "borderline" in the verbal, nonverbal, and composite IQ categories. On an academic functioning test, she scored "extremely low" on the math computation section and "very low" on the other sections. She reads at the equivalent of a 4th-grade level.

- The psychologist noted that Mother's "difficulties with decision-making and problem-solving may be associated with her rather significant depressive feelings coupled with her significant cognitive limitations." Further, Mother "gets her sense of worth by having children[,] but she doesn't have a realistic means to provide for her children as she is currently dependent upon others."

- The report included a note that "the prognosis is guarded for significant changes to occur for [Mother] in a short time frame as her issues are chronic and long-standing."

During the case's pendency, Mother's attorney objected to the service plan because, among other complaints, it was "not written in a way that [Mother] can understand what is required." In November 2023, the trial court ordered the plan to be modified to drop some services, and the Department created a simplified document that put all of the information that Mother needed on one page to make it easier for her to understand. Nogueira took over the case the same month, and she testified that despite the simplified plan, Mother still did not complete all of her services.

- Mother's simplified service plan included "engagement in Safe Care program, individual counseling with anger management, Safe Babies, mental health evaluation, and proof of housing and income."

- Nogueira, like Toombs, sent Mother reminders "to make sure she's on track and [to] see if she's making any progress with any service providers," but Mother's participation in services was nevertheless "lacking."

- Mother completed the Safe Babies class, and Nogueira stated that Mother was "engaged with" the Safe Care program but had completed only part of it. However, as we discuss more below, Mother had not been consistently attending individual counseling, and she had only provided Nogueira with proof of employment "for about two weeks."

Both Toombs and Nogueira addressed Mother's relationship with the children and whether she had demonstrated the ability to improve as a parent.

- Toombs stated that Mother initially had a strained relationship with the two older children. They did not engage with her during visits, and Aiden did not listen to any instruction from her. Toombs thought Mother's relationship with the older children "got a little bit better with the help of Safe Babies." However, Nogueira testified that while she was the caseworker, Jacob and Aiden were not interested in engaging with Mother during visits.

- Jacob is autistic and has academic and educational delays for which he began receiving services through the Department. The Department initially believed that Aiden could also be autistic, but according to

14

Nogueira, he made "significant improvements" while in foster care, "[s]o he wasn't presenting those symptoms anymore." However, he does receive speech therapy.

- Nogueira testified that Mother had not made behavior changes during the case, and she had concerns about the children going home with Mother. She explained, "[Mother] has not shown that she's capable of taking care of her own mental health and basic needs, and so I have no clue how she would take care of three children, especially [Jacob], where he has high needs. It wouldn't be logical."

- Toombs also expressed concerns about the children's well-being if returned to Mother. She stated that Jacob "is a particularly high-needs kid," and she was concerned that Mother, who is easily overwhelmed and "doesn't have her own basic needs laid out," would be unable to adequately take care of him. Additionally, because Mother lacks reliable transportation, Toombs worried that Mother would not be able to take Jacob to his weekly therapy appointments or take Aiden to his speech therapy appointments.

- Nogueira also stated that in the past, Mother's feeling overwhelmed had resulted in physical abuse to the children. However, Nogueira provided

no further testimony about what abuse had resulted from Mother's feeling overwhelmed.

- Nogueira also stated that she would be concerned about the children's emotional safety if returned to Mother.

- Nogueira did not believe that Mother would be able to improve if she were given more time. Nogueira said, "She's already been given a year. Given her past history, you know, this is not a first involvement with Child Protective Services. There was even a small extension in the case. And nothing has changed since then, so I don't believe that any of her circumstances would change."

- Jacob was placed with his former foster parents, and the two younger children were placed in a foster home together. All three children appeared comfortable, were well bonded with the foster parents, and "were making great progress."

The Department put on further evidence of Mother's problem with follow-through with the testimony of Kristin Short, the Tarrant County group treatment coordinator for the Department's crisis intervention program, and Ora Beth McMullen, a licensed clinical therapist with whom Mother had multiple appointments during the case. Short testified about how Mother had been discharged from multiple classes for failing to attend. Although these classes were dropped from Mother's simplified service

16

plan adopted at the end of November 2023, because they were still part of her plan during the time that Short was working with her, the trial court permitted Short's testimony on the subject to show how Mother dealt with her services.

- Mother signed up to attend a twelve-week parenting class that began in June 2023. She did not attend any of the classes and was discharged for that reason.

- Mother signed up for the next class that began in August. She attended four of those classes but then missed two and was again discharged.

- Mother then asked to be placed in the next class, which began in October. She did not show up for any of those classes.

- Mother also signed up for an anger management class that began in September, but she only attended one class before being discharged for absences. She asked to be placed in the next class that began November 15. She did not attend that class and was unsuccessfully discharged.

- Short acknowledged that because the classes were for an hour and a half during the work week, it would not be easy for a parent to attend a class if the parent had a job during that time. However, there was no testimony that Mother had missed any of the classes because of work.

McMullen testified about her sessions with Mother and about Mother's failure to follow up with suggested treatments.

- McMullen's first session with Mother was on October 4, 2023. They had ten sessions. The last session was on January 3, 2024. In the first session, McMullen developed a treatment plan with Mother to address Mother's mental health issues.

- That plan included a request that Mother go to MHMR and have a psychiatric evaluation. This evaluation differed from the psychological evaluation that Mother had already undergone; McMullen had diagnosed Mother with major depression and wanted to get confirmation of that diagnosis from a medical doctor. "And if the doctor felt necessary, then the doctor would prescribe her antidepressant medication[,] which would help improve her [mood] and her ability to function."

- McMullen felt that "[Mother's] mental health needs were top priority" in their counseling sessions, so she asked Mother to schedule the evaluation "immediately." However, it took Mother almost two months—at the end of November 2023—to contact MHMR, and she did so only after McMullen told her that she would be discharged if she did not follow through with that task.

- MHMR gave her an appointment for an evaluation, but not until February, so McMullen recommended that Mother go to the JPS psychiatric emergency room and take her diagnosis paperwork with her

18

"so she could begin medication if the doctor at JPS felt like that was indicated."

- Mother did follow that recommendation, and in mid-December, she received a prescription for Lexapro from a JPS doctor. However, "[i]t became evident [to McMullen] that she was not taking the medication on a regular basis." That concerned McMullen.

- Mother confirmed during her testimony that she had stopped taking the medication. When asked why, she stated that she "didn't want to take it anymore," but there was no specific reason. When asked if she felt like the medication was making a difference for her, she answered, "No."

- McMullen testified that Mother's participation in her treatment was "minimal," with the exception of one November appointment in which Mother "participated well."

- In addition to getting Mother a psychiatric evaluation, McMullen's treatment goals also included Mother's learning about abuse and neglect, including how her past actions had affected her children; learning about trauma that she had endured as a child and how it had affected her as an adult; demonstrating that her children were a top priority by knowing how her children were doing, what services they were receiving, and their medications; and learning appropriate coping skills "to help her with life

19

in general in a variety of different circumstances." Mother did not accomplish these goals during their sessions.

- McMullen felt like she was beginning to develop a rapport with Mother "toward the end of [their] tenure," but Mother then decided to change therapists.

Nogueira discussed Mother's failure to continue her individual counseling with the new therapist.

- Nogueira learned that after Mother switched to the new therapist, she had again been unsuccessfully discharged.

- Mother also did not attend her February MHMR appointment for her psychiatric evaluation. Mother testified at trial that she missed the appointment because she had to work that day.[7] Nogueira and her supervisor then decided to consider Mother's JPS appointment as the psychiatric evaluation and that Mother "would have continued medication management through the medication logs."

---

[7]Mother's appointment was for 8:40 a.m., and Mother testified at trial that her work hours were 2:00 to 11:00 p.m. Thus, it is not clear why Mother's having to work that day prevented her from keeping her appointment. She did not say in her testimony whether her working hours were different on the day of the appointment that she missed.

- However, Mother did not provide Nogueira with anymore medication logs and, as noted above, Mother decided on her own to stop taking her medication.

The parties also put on evidence about Mother's unstable housing situation during the case. That evidence showed that from the FBSS case on, Mother did not have consistent housing and relied on family and friends to house her.

- Mother was initially living with her mother and stepfather. In July 2022, her stepfather kicked her out of that home. At some point, she lived with her grandmother and brother. She also lived for part of the time with her boyfriend or friend and part of the time with her father. She was evicted from the home where she lived with her father after he was arrested.

- During the FBSS case, Hall gave Mother applications for housing and sat down with Mother on "multiple occasions" to work with her on an application for housing vouchers. She never received all the documents needed from Mother to complete the application.

- Toombs also tried to help Mother obtain housing. Toombs helped Mother complete two housing applications to get on a housing wait list. There was a delay in completing one of the applications because there was an "issue with [Mother's] ID." Toombs got Mother the application she needed to obtain an I.D. in order to complete the housing application.

- At trial, Mother testified that she was living with her aunt. According to Mother, her aunt had said that the children could live there, too. If that occurred, Mother and the three children would share a room. Mother did not provide details about whether she was allowed to stay with the aunt indefinitely, whether she was on the lease, or whether she had plans for moving elsewhere.

Mother was unemployed for most of the time from the FBSS case until trial.

- Mother was not employed during the FBSS case.

- Mother was not employed while Toombs had the case.

- Mother got a job in November 2023 with a staffing agency, through which she provides cleaning services. Nogueira testified that Mother had only provided her with proof of employment "for about two weeks."

- Mother testified that at the time of trial in April 2024, she was making $11 an hour working for the staffing agency. Her work is apparently not steady; Mother testified that she had been "in and out" with that employer since November. She testified that her hours generally fall between thirty to thirty-five hours a week.

Mother testified about how she would care for the children and pay for their needs and what she had learned during the case. However, she also acknowledged that she could not yet provide for the children on her own.

- Mother acknowledged that she does not know how to drive and that because of her lack of reliable transportation, she could not currently meet the children's needs. But she claimed that she was learning how to drive and that her aunt had offered to assist with transportation.

- Mother pays her aunt $300 a month in rent. After that payment, Mother has $500 left from her monthly paycheck from which she would need to pay co-pays for the children's therapy and services, groceries, and childcare. She said that her aunt had offered to provide childcare and that she would pay her aunt for doing so, but she did not say how much her aunt would charge her. Her aunt did not testify.

- Mother believed she had the financial ability to pay for the services that her children needed, but she had not looked into the costs of those services. When asked how she could be sure that she would be able to provide financially for her children, she answered, "I don't know." However, Mother had already managed to save $800.

- Mother stated that through services, she had learned "how to do bedtime and groceries and how to take care of the kids when [she's] at home" and that the most significant thing she had learned was that if she "ever need[s] to do something like go wash or wash dishes, to make sure the kids are occupied." She stated that if she were to feel overwhelmed by her children

23

in the future, she would "[g]ive them their own space" by leaving them alone for a few minutes.

- Mother agreed that her children deserved stability, but she did not believe that she was capable of providing stability at that point.

After hearing the evidence, the trial court terminated Mother's parental rights.

**B. Analysis**

With respect to the endangerment finding, Mother argues that

- the Department made no finding of neglect against her related to Aiden's having diaper rash in February 2022;

- there was no testimony that Mother had not been supervising her children when the children's aunt injured Aiden or that Mother had any knowledge that the aunt was a danger do Aiden;

- regarding the fight that led to Mother's grandmother kicking Aiden, there was no testimony about prior arguments between Mother and her grandmother that would have suggested the environment was endangering or that Mother's actions led to Aiden being accidentally kicked by the grandmother; and

- there was no evidence presented "regarding the circumstances that led to Mother telling the caseworker that she needed time to get herself together and the children coming into care" and "no evidence about where the

24

children were living, what the Department expected Mother to do differently, or whether anything aside from Mother's financial situation . . . led to her feeling like she could no longer care for her children."

However, whether we consider all the trial evidence or only the evidence that supports the endangerment finding, the trial record contains sufficient evidence for a factfinder to form a firm conviction or believe that Mother endangered her children.

For one, the record shows Mother's inability to demonstrate stability for her children. *See In re M.B.*, No. 02-15-00128-CV, 2015 WL 4380868, at *14 (Tex. App.—Fort Worth July 16, 2015, no pet.) (mem. op.) (noting that it was not mother's poverty that showed endangerment but her inability to demonstrate stability); *see also Sawyer v. Tex. Dep't of Protective & Regul. Servs.*, No. 03-02-00286-CV, 2003 WL 549216, at *9 (Tex. App.—Austin Feb. 27, 2003, no pet.) (mem. op.) (noting that housing and financial instability can endanger children). The record contained ample evidence of Mother's spotty employment, lack of reliable transportation, and lack of stable housing throughout the case. The Department offered services to try to help with some of those issues, but Mother had trouble taking advantage of those services. For example, the Department tried to help Mother obtain housing, but she was unable to complete the applications during the FBSS case even with Hall's help, and she needed more hand-holding from Toombs to get the applications completed. Throughout the case, Mother had moved from or been kicked out of homes with family members multiple times

since the Department became involved with the children in the FBSS case. Given the evidence, the trial court could have disbelieved Mother's testimony that her aunt's home would provide more permanent stability.

Similarly, Aiden still needed speech therapy, and Jacob needed therapy and other services. Mother does not know how to drive, and she had habitually missed her own appointments during this case even when transportation was provided for her by the Department, and even though successful completion of her services was a prerequisite for the children's return to her. Thus, despite Mother's testimony that her aunt had promised to help, the trial court could have concluded that Mother would be unable to consistently take the children to their appointments. *See In re A.H.*, No. 02-21-00402-CV, 2022 WL 1682422, at *11 (Tex. App.—Fort Worth May 26, 2022, no pet.) (mem. op.) (noting that a factfinder may measure a parent's future conduct by the parent's past conduct). Mother presented no evidence of any back-up plan for transporting her children should her aunt be unable to help and no evidence of a plan to help her keep the children's appointments. Importantly, she admitted that she was not yet capable of providing the children with stability.

Further, Mother had stopped her medication, apparently not on advice of a medical professional but because she simply did not feel like taking it anymore. Granted, there was no testimony about how the medication helped her or how—or if—she was affected by stopping it. Thus, there is no evidence that Mother's stopping her medication directly caused her to jeopardize the children's well-being. *Contra In re A.C.*,

26

No. 11-23-00056-CV, 2023 WL 6150356, at *5 (Tex. App.—Eastland Sept. 21, 2023, no pet.) (mem. op.) (considering testimony of psychologist that mother's consistent disregard of medical instructions for her medication increased the chance of mother having a manic episode "or an episode where she was not in control"). But this evidence can be considered as part of a pattern of behavior—specifically, Mother's inability or unwillingness to complete services (like the counseling that could help with her anger issues), follow through with recommendations, or consider likely consequences for her actions—that contributed to endangerment. Accordingly, the trial court could consider the fact that Mother had stopped taking her medication without first consulting a medical professional, especially when combined with her inconsistency in attending counseling and her failure to attend her MHMR evaluation appointment, in determining whether Mother had or could provide a stable environment for the children. *See In re A.J.A.D.*, No. 01-22-00521-CV, 2022 WL 17813763, at *8 (Tex. App.—Houston [1st Dist.] Dec. 20, 2022, pet. denied) (mem. op.) (noting that "[o]ne purpose of a family service plan is to identify parental shortcomings and provide assistance in remedying them so that the parent's behavior does not continue to jeopardize or adversely affect his or her children's physical or emotional wellbeing" and thus a parent's failure to complete services can be relevant to endangerment, especially when the parent's failure indicates that past endangering conduct remains unaddressed and is likely to continue in the future); *see also In re A.I.*, No. 02-22-00176-CV, 2022 WL 4374636, at *18 (Tex. App.—Fort Worth Sept. 22, 2022, pet. denied) (mem. op.) (considering parent's failure

to demonstrate compliance with her depression medication and failure to be discharged successfully from therapy in Subsection (E) analysis).

Moreover, Mother was not employed during the FBSS case, and after the children came into the Department's care in March 2023, Mother did not find employment until November. At trial, she presented pay stubs for work she did in November. She did not provide any pay stubs for work after November, and Mother testified that she had been "in and out" working for that employer. She did say that she had been working 30 to 35 hours a week, which the trial court could have construed to mean that she had begun working more consistently around the time of trial. That and the fact that she had managed to save money was a good sign of progress, and one that Mother will hopefully be able to maintain. However, even if the trial court believed that she had been regularly working 30 to 35 hours a week, the trial court had evidence from which it could have concluded that Mother's maintaining employment was too little, too late to show that she was willing or able to provide the children with stability. *See In re T.G.R.-M.*, 404 S.W.3d 7, 15–16 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (considering mother's lack of housing stability and lack of employment in Subsection (E) analysis); *R.W.*, 129 S.W.3d at 739 (noting that conduct that subjects a child to a life of instability endangers the child).

Additionally, and most importantly, the record also shows that Mother suffers from anger issues and feels overwhelmed caring for the children, and the children had been injured in her care. The Department had previously been involved after Aiden

28

suffered a broken leg when he was only six weeks old. The FBSS case had begun after the Department received a report that Aiden had severe diaper rash and that Jacob had bruises under his eyes, an injury for which Mother did not provide a straight explanation. Aiden was injured during a physical fight that Mother had with her grandmother in front of her children—a fight in which Mother apparently punched her grandmother in the face.

Also, Aiden was injured by Mother's young sister. Of course, children in any family may fight and sometimes injure each other, but Mother acknowledged to Hall that she had a hard time breaking up the children's fights or redirecting the children, and the Department concluded from its investigation that the injury had resulted from neglectful supervision. While that injury alone would not be sufficient to show endangerment under Subsection (E), *see E.N.C.*, 384 S.W.3d at 804–05 (stating that Subsection (E) requires a continuing course of conduct), it could be considered as part of a pattern of behavior. Further, Mother did not finish any of her services during the FBSS case, and during this child protection suit, she did not finish her individual counseling, which could have helped her with her feelings of being overwhelmed and with her anger management issues. *See A.J.A.D.*, 2022 WL 17813763, at *8; *see also In re G.M.M.*, No. 01-20-00159-CV, 2020 WL 5048140, at *10 (Tex. App.—Houston [1st Dist.] Aug. 27, 2020, no pet.) (mem. op.) (considering in Subsection (E) analysis evidence of instability and fact that for more than a year after child was removed from

29

her care, mother "failed to access available assistance programs and to make progress toward stabilizing a home and becoming a better parent").

While Mother testified at trial about what she had learned during the case about how to be a better parent, *see In re D.T.*, 34 S.W.3d 625, 640 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh'g) (stating that a parent's efforts to improve parenting skills are relevant in determining whether a parent's conduct results in endangerment), the trial court could have found that whatever recent improvement she had shown in parenting skills, it was not enough to negate the other evidence of endangerment.

Mother puts the blame on McMullen for Mother's not completing her counseling. She says the evidence shows that Mother's lack of rapport with McMullen and subsequent change of therapists was caused by McMullen: "This evidence included that the therapist spent one session talking to Mother about relinquishing her parental rights despite Mother not being interested"; "Mother's mother [being] invited [to one session] and asked to talk about traumas that Mother was too young to remember"; and McMullen's threats "that she would stop therapy if Mother did not go to JPS for a psychiatric evaluation, despite the fact that Mother had already engaged with MHMR as required by her service plan."

However, none of these arguments persuade us that it was McMullen, rather than Mother, who was responsible for Mother's failure to complete her counseling. McMullen testified that she suggested that Mother go to JPS because Mother had dragged her feet on scheduling an appointment with MHMR—scheduling it only after

30

McMullen told her she would be dropped from counseling unless she made the appointment—and once Mother finally did schedule the appointment, it was for a date months away. Ultimately, Mother did not attend that MHMR appointment and stopped taking the medication prescribed for her at JPS. In other words, McMullen did what she could to get Mother a psychiatric evaluation and, if needed, medication, but Mother resisted those efforts.

Regarding McMullen's asking Mother about whether she was interested in voluntarily relinquishing her rights, McMullen did so at the request of a caseworker "to make sure that [Mother] had a safe therapeutic place for her to discuss those options along with her attorney." McMullen testified that after Mother said she was not interested in relinquishment, McMullen did not discuss it further. Finally, regarding the session with Mother's mother, one of McMullen's goals for Mother was for her to learn about the trauma that she had endured as a child, how that trauma affected her as an adult, and how she could move past it. Mother does not explain how a therapist's exploring past trauma with a client would cause a lack of rapport with or responsiveness from the client or how McMullen's exploring that topic was improper. Additionally, Mother does not explain why she stopped seeing—and consequently was discharged from—her new therapist as well.

For the above reasons, we hold that legally and factually sufficient evidence supports the trial court's finding of endangerment under Subsection (E). We overrule Mother's second issue. Because only one predicate termination ground is required to

support termination, we need not address Mother's first issue challenging the Subsection (D) finding or Mother's third issue arguing that she had established the affirmative defense to a Subsection (O) finding. *See* Tex. R. App. P. 47.1.

## II. Best-Interest Finding

In Mother's fourth and final issue, she argues that the evidence was factually insufficient to support the best-interest finding.

### A. Relevant Factors

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). In determining whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence in light of nonexclusive factors that the factfinder may apply in determining the child's best interest:

>  (A)   the child's desires;
>
>  (B)   the child's emotional and physical needs, now and in the future;
>
>  (C)   the emotional and physical danger to the child, now and in the future;

(D)    the parental abilities of the individuals seeking custody;

(E)    the programs available to assist these individuals to promote the child's best interest;

(F)    the plans for the child;

(G)    the stability of the home or proposed placement;

(H)    the parent's acts or omissions indicating that the existing parent–child relationship is not a proper one; and

(I)    any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

**B. Analysis**

Mother contends that

- the Department presented no evidence as to the children's desires or the specific emotional and physical needs of the children that Mother would be unable to meet;

33

- although Mother's psychological profile showed borderline intelligence, there was no evidence showing that Mother was indifferent to her children's well-being or that she exhibited malice toward them;

- The Department presented no evidence about the children's desires and did not address the specific needs of the children that Mother would be unable to meet;

- although Mother stated that she would not be able to meet the children's needs because of her transportation issues, her aunt would assist her with transportation;

- Mother testified that she was committed to her children continuing to receive treatment and had the ability to pay for services; and

- Mother described her plan for the children and testified about what parenting skills she had learned in her services.

Based on these assertions, Mother challenges the sufficiency of the evidence to show that termination was in the children's best interest.

The Department presented evidence that Mother had a pattern of unstable housing and had been unable to provide the care that the children needed in the past. *See O.G.M. v. Dep't of Fam. & Protective Servs.*, No. 14-23-00424-CV, 2023 WL 8464998, at *7 (Tex. App.—Houston [14th Dist.] Dec. 7, 2023, no pet.) (mem. op.) ("Lack of stability, including a stable home, supports a finding that the parent is unable to provide

for a child's emotional and physical needs."). Jacob and Aiden had both suffered injuries under Mother's care, including bruising on Jacob for which Mother did not offer a consistent explanation and bruises on Aiden that happened because Mother had a physical fight with her grandmother. In her testimony, Mother did not take any responsibility for creating or participating in the situations that resulted in the injuries. Other than testifying that she had learned to take a few minutes away from her children if she felt overwhelmed by them, Mother presented no testimony about how she had learned to manage her anger so as not to repeat the behavior. *See In re A.L.*, No. 04-17-00620-CV, 2018 WL 987484, at *6 (Tex. App.—San Antonio Feb. 21, 2018, no pet.) (mem. op.) (considering in best-interest analysis the fact that the mother "has an unstable temperament and is susceptible to being overwhelmed by having to take care of [four] small children").

Mother's participation in therapy, which was supposed to help her with her anger issues and feeling overwhelmed, was reluctant and incomplete. Although Mother blames the problem on the therapist and her lack of rapport with Mother, Mother switched to a new therapist and still failed to keep appointments. Further, under Mother's care, Aiden displayed behavior that made the caseworker suspect that he was autistic, but the behavior resolved after he was placed with foster parents. Mother did not present any testimony or other evidence about having learned how to care for an autistic child with Jacob's needs. Although the first caseworker believed that Mother's interactions with the two older children had improved some after her participation in

35

the Safe Babies class, the second caseworker did not share that opinion and reported that Aiden and Jacob were not interested in engaging with Mother during visits. In other words, it appears that those two children do not have a significant emotional connection to Mother. *See Sawyer*, 2003 WL 549216, at *10.

As for Mother's plans, she wanted the children to live with her in her aunt's home, and she believed that she could take the children to their appointments with her aunt's help. She said that her aunt would provide childcare while she was at work, and she intended to enroll the children in HeadStart to provide them care during the time when she and her aunt were both at work. She did not discuss any plan for what she would do if her aunt stopped providing care or could not take the children to their appointments. She did not know the costs of the children's services. She did not discuss any plan for ensuring that she could be more reliable with the children's appointments than she was with her own during these proceedings. *See id.* (stating that from the evidence, "[a] jury could reasonably infer that [the parent's] parenting skills are low, that [the parent] has not made genuine attempts to improve them, and that the children's needs could be better met by the [foster parents]," and that the parent's established pattern of not responding to the Department's offered services weighed in favor of termination).

The children's foster homes, on the other hand, were stable placements with foster parents who were motivated to adopt, and the children were bonded with and were doing well with their foster parents. Jacob's foster parents had served as his foster

parents once before, and the two foster families planned to continue ensuring that the children had access to each other.

In light of the entire record, including evidence of the children's needs; the older two children's apparent lack of interest in engaging with Mother; the endangerment of the children, including the instability provided by Mother and the physical injuries to the children while in Mother's care; the stability provided by the foster parents; Mother's parenting abilities; her failure to diligently participate in the services designed to help her; and her plans and those of the foster parents, we hold that factually sufficient evidence supports the trial court's best-interest finding. We overrule Mother's fourth issue.

## Conclusion

Having overruled Mother's second and fourth issues, which are dispositive, we affirm the trial court's judgment.

/s/ Mike Wallach
Mike Wallach
Justice

Delivered: October 17, 2024